Good morning, and may it please the Court. I'm Matthew Zevin from the Stanley Law Group. I represent the plaintiff and appellant Wendy Chowning. With me is my co-counsel, Mr. Derek Emge from the Emge Firm. I would like to reserve two minutes for rebuttal, if I can. The California legislature has not once, but twice, outlawed false price discounts. And in Hinojos v. Kohl's, same defendant, the 9th Circuit— Your opposition has admitted they violated the statute. We're just here on what is the available form of restitution. Correct. So let's get there. Restitution and damages, Your Honor, because we do have a measure of damages. Well, I understand, but I'm trying to figure out why there's anything more than the restitution, but you'll be able to talk to me about that. But let's turn to the restitution first. Sure. Well, Your Honor— Tell me why In Re Tobacco Cases 2 doesn't say, here's your restitution, how you determine restitution, get it done. Well, I will tell you that this court in Pulaski and Middleman tells you how to get restitution. Pulaski is a standing case. It's not a restitution case. Pulaski is not a restitution case in my book. In Re Tobacco Cases 2, which is, after all, California's case law in the first place, Pulaski, first of all, was decided before the tobacco cases. It was our case. It wasn't the California cases. And here we are, and in my book, it's a standing case. But let's get back to this. Why isn't In Re Tobacco Cases 2 the law I should apply? It is. It is the same law, but entirely different facts. Both Pulaski and Tobacco 2 are relying on the same law. I agree with you. Neither one of them changes the law. They're just applying California law to the specific facts of the case. Well, but In Tobacco Cases is very straight. It says, this is the difference between what the plaintiff paid and the value of what the plaintiff received. That is the proper measure of restitution.  And when you're looking at the value, you're looking at the value that a reasonable consumer would have paid at the time had they known the truth. That's the economic harm that you're trying to restore. No, no, no. That isn't what it says. It says difference between what the plaintiff paid and the value of what the plaintiff received. That has nothing to do with what they paid other than we've got to do what they paid. But we're now looking at the value of what they received. And I guess I'm having a tough time. I didn't even find any evidence that you put in there about the value of what your client received. The California Supreme Court has never made that statement that you just made. This is an appellate decision, and it cannot create new law. Just a minute. The California Supreme Court may not have made it, but I've got a lot of cases. I guess I've got to cite the case, the Ninth Circuit case that says I take the top California appellate case and I apply it. Correct. But what you've done is taken one broad statement from that case. And that case, the tobacco case itself, specifically says that despite a court's broad ruling, the case only stands, it's only as good as the facts before it. And the facts in that case were so drastically different from what we have here. In that case, the plaintiff said, we don't have to show a loss. We don't have to show any loss. We can get restitution solely for a purpose of deterrence. Without any showing of loss, they could not show any loss for any class member. We do show a loss in our case. It's the economic loss that's recognized in the Kwikset case. Well, only if she paid more. So you have to compare the value she got and what she paid to see if you have a loss or not. Not under California law. Not under Kwikset. Kwikset is the California Supreme Court. And that case specifically says a consumer suffers a loss whenever they spend money that they would not have spent but for a misrepresentation, a material misrepresentation. And that case is binding. And it goes through a very extensive analysis. The Kwikset case is really the key to all of this. Well, it's interesting that you're quoting Kwikset, because Kwikset right in it says that this phrase you want to talk about from, if you will, is a standing issue right in Kwikset. And now I have tobacco cases in front of me, and I have the exact language from tobacco cases, and they tell me what to apply, and so I try to apply it. Okay. The Kwikset case is broadly a standing case, but what element of standing? It's talking about economic harm, monetary loss. But you can have one thing for standing that gets you into court, and maybe what you get then is injunctive relief and a different rule for exactly how you calculate the damages once you're in court. They don't have to be exactly the same. That's generally true. But the times that it would not be the same is, for example, if the — in order to get restitution, you have to show that there's a measurable loss and that money was acquired by the defendant, and there has to be a direct causal link. So the Kwikset case says — it talks about there's cases where the defendant didn't necessarily get money directly from the plaintiff, and therefore the plaintiff can't get that in restitution. They still have standing. But that's not the circumstance we have here. Here we have a direct loss. We have a company that violated not one but two specific California statutes. They extracted money people through a fraud. But all of that said, it seems to me you're making a jury verdict or a jury argument. I want to talk about the law as it is. They did all these bad things you're suggesting they did. How do I get around Tobacco Cases 2, which says what I got to apply here is the difference between what the plaintiff paid and the value of what the plaintiff received? And when you're talking about value, I would say — I mean, the value is, what is the value to that plaintiff? Now, you can't argue that your client didn't get any value. Well, the value — Do you argue that your client didn't get any value? I would have to ask a question. When are we talking about — Don't ask me the question. Answer mine. Right. But value is — I mean, you admitted that — I mean, she admitted that she received some value for the articles she purchased. She says she's not really dissatisfied with the quality of the dresses. She says she's satisfied with the robe. I mean, she admits she got some value there from — I thought you were conceding that you would lose if we say price-value differential applies. Absolutely not, Your Honor, because we had evidence of a price-value differential. Where do you have evidence of that? It's the evidence that — It requires using the mode, though, instead of the mean. No, no, no. Either one. Actually, if you use the mean, the average — and I'm sorry, I didn't mean to cut you off. Go ahead and please explain because I couldn't — I don't think your mean gets you there. Unless you use the whole life. Life. But the whole life doesn't — I don't know how you justify the whole life or the mode. You've got to justify at least one of those, and I don't really see what the justification is. Let's talk about the whole life because that seems to be the big issue. In Spann, the court said this is a jury determination what the value is of a product, right? So the jury should decide. What evidence do you have that there's a price-value differential? If you look at the whole life of the product — Doesn't Business and Professions Code 17501 in the part about misleading advertising say that the value is determined at the time of the publication of such advertisement in the locality where the advertisement is published, which means at the time, not over the whole life of this product, which could have been on the rack for 10 years? In the normal world, yes, but not when there's a fraud. A fraud is — But the provision is about false advertising, so that's when there's fraud. Right, but what I'm saying is every transaction was tainted by fraud. Our client went in and thought she was buying a $46 robe for $23. Turns out that wasn't a $46 robe. They never gave her a $46 robe, and she said she never would have bought the robe had she known she wasn't getting a discount, so she wouldn't have paid that $23. And it turns out more people — But the question is what value did she get? And I think the statute tells us we need to look at least close to the time at which she purchased it. So maybe you look at the last few months and you average that, but the whole life could be a long time. It could be, but, again, this is a jury question, and there's evidence. You have to give consideration to the fraud. Everybody who's buying it, nobody bought it at the $46. Nobody. So what is the value? You've got this continuing fraud throughout the entire lifecycle. Our client was one of the first people to be defrauded. She said, oh, I thought I got a $46 robe. I paid $23. Now I see everybody is getting this dress or this robe for cheaper. I was the first one to get ripped off. I paid more than them. Shouldn't it be a jury question at least to decide what the actual value of that is? And we think that the district court robbed the jury of its fact-finding role in looking at that. But how under the statute do you get to the whole life of the product being a measure of the value at the time of sale? Well, the value is the price that a normal person, a willing buyer and a willing seller would exchange, right? But that assumes that there's no fraud. So if there's a fraud, it sort of changes everything. All those transactions are tainted by the fraud. They're what you can't say those were arms-length transactions. They weren't. So I don't think that establishes the value because every transaction But you're using, but that's an argument that you can't use the sale price of any of the sales, but that you are using them. You're averaging over the lifetime. I'm not saying you can't. I'm saying that you have to consider it all. A jury should be able to look at all of this evidence and make its own determination of what the value is. That's why in the Spann case, the court said the jury could look at all this and decide that one of those is the actual value or something else altogether. You're on summary judgment here. So even if we go where you want to go, your expert, as I understood, said, I'm not expressing an opinion on the retail value or the actual value. Right. So, therefore, we had no evidence upon which you could advance this idea, even if you get it there. No, the evidence is the data itself. He's collecting the data and saying, if you take the average. Well, but just because you have some value that's collected, what gives me the idea? I mean, what's going to give the jury the idea of what the retail value or the actual value is? All these sales transactions. Because you've got some values sitting there and they could use any one if they can? Well, no, it's based on actual transactions. I understand what's based on. Each and every one of which was tainted by this fraud, this continuing fraud, misrepresentations. The jury could say, look, that most people paid $24. Well, how can the jury say that? What expertise would the jury have for that when your expert says he can't even form an opinion as to that? He didn't say he can't. He said he's not offering an opinion because you could look at the value in a lot of different ways. And he's providing several different ways that a jury could evaluate the value. And that's a jury function. It's the jury's role to determine the fair market value. So you're saying it's within the jury's parameters to apply mode and a lifetime with, as Judge Friedland said, close on the rack for a decade? If that were the facts. That's not the facts in our case. We don't know, right? Right, because we never went to trial. But if we did go to trial. Do you have evidence that none of the things were on the rack more than two or three months? We do have all the evidence of how long everything, these specific products, we have the evidence of how long they were on the rack, yes. And every transaction, we have all that evidence. And that's where he got this data. And what's the longest they were on the rack? Your Honor, I don't remember that off the top of my head. I'm sorry. It was not years. I can say that. Do you know where in the record that is? I'm not sure if the actual backup. It's in our expert's report. I don't know if he actually says how long. I don't know if he actually gives that specific answer. We have the data. I don't know if the data. I'm not sure we have it. No, exactly. I'm not sure we have it. That's what I'm saying. I don't know if he actually said how long each of these, like how long the life cycle was for each product. If you're relying on for part of your answer that it wasn't years, it's hard for you to do that without having the data in the record for us. Correct. Also, I mean, that's the problem with deciding this on summary judgment early in the process when we hadn't completed discovery. We were very early. Well, did you say we need more time for, this is premature, we need more time for more discovery? No, because this issue didn't come up. We were relying on the Spann case that said, based on this exact same situation, this is a jury question of what the value is. And a jury should be able to decide from these different things. And I would agree. If there was no fraud, I would say every transaction prior to her, her transaction establishes the value. But that's when there's no fraud. Here we have a fraud in every single transaction, not one unit sold at the regular price. So everybody who's buying it is thinking they're getting something worth more than they're spending for it. And that influences consumer behavior. That, if you, the Enosis v. Kohl's case talks all about that. False price comparisons matter. They influence consumer behavior. And they cause a more obvious economic harm than other types of misrepresentations because the lie is about the value of the product itself. And it influences people to buy things that they wouldn't have bought otherwise. Thank you. I see my time is running out, but we'd like to reserve time for rebuttal. Okay. Thank you. James Spire. Good morning, Your Honors. James Spire for Kohl's. In addition to the directly on point Tobacco II case, which we believe bars the so-called alternative measures of restitution that the plaintiffs are proposing here, we have a series of landmark cases from the California Supreme Court. And those cases establish that a plaintiff cannot recover more through a UCL action than she can through a tort action. That's a fundamental limiting principle. That also bars these so-called alternative measures. And what Chowning wants to achieve here is exactly what the California Supreme Court has barred. She wants to achieve a recovery greater in a UCL action than she can obtain through a tort action. The California Supreme Court has said that the UCL strikes a balance between broad liability on the one hand and limited relief on the other. And that's because the overarching concern, that's from Korea Supply, the overarching concern of the legislature was to provide, quote, a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition. And so under the California Supreme Court jurisprudence, injunctive relief is the primary form of UCL relief, and they consider monetary relief, quote, mere ancillary relief. That's in quicksand. What this means is that the UCL cannot be used, quote, as an all-purpose substitute for a tort or contract action. That's Cortez. So what we're really looking here is an equitable remedy, right? Yes, Your Honor. And if we have an equitable remedy, of course, restitution could be that remedy, right? Restitution is, in fact, the only monetary remedy under the UCL. That's what I was about to say. And so what's your best case, other than Tobacco Cases 2, because we've got to read the phrase in Tobacco Cases 2 the way you do, to suggest that the price-value differential is not available? Well, my best case from the Ninth Circuit is the Brazil v. Dole case. I realize that's an unpublished opinion, but I happen to think that the reasoning is extremely persuasive. Other than that, since they're not going to have any one of us, maybe Judge Lynn can just cheer because she looks at unpublished, but Judge Friedland and I can't even look at those. We've got lots of district court cases, Your Honor, saying that price-value differential is the appropriate measure. That's what I had in front of me. It seems to me the best I have is in Tobacco Cases 2 and the interpretation in Tobacco Cases 2, and after that, district court cases. Would you agree? And I think In Re Vioxx from the California court would be better. Because the In Re Tobacco Cases 2 really, as I understand it, interpreted In Re Vioxx, right? That's correct. That's correct. So is this a case where there's, in effect, a wrong without a remedy? So this woman comes in thinking she's getting a great bargain. She wouldn't have come in at all. Sure, she buys a robe and a dress that have value, and that means that the fact that she got tricked, deceived, defrauded into the store in the first place, there's no remedy. There absolutely is a remedy, Your Honor, if they can prove what the UCL requires, which is proving a price-value differential. If they can prove a price-value differential, they can recover. This is not a case where there's no remedy. But how do you respond to his point that if you have to use the sales of products that were only sold at Kohl's and all of them were falsely labeled, we don't really know what the value was? Well, let me get to that, because I don't think that they have proven any price-value differential in the case. Well, the price-value differential, the very phrase is uneasy to me, because it seems to me that in right-to-backer cases would say, we're proving what the difference between what the plaintiff paid, there may be the price, but the value of what the plaintiff received, I'm not sure that has anything to do with the prices of the product to be sold in the future or in the present or anything else. Your Honor, that is absolutely correct. The price of a product may equal the value of the product, but it also may not. That's why people talk about I overpaid for that product. That's why people say, on the other hand, I got a great deal for that product. So how do you think we should figure out the value here? Well, what the plaintiffs say is that the value of a product is equal to the market price of the product. And in order to determine the market price of a product, the first thing you have to do is figure out what the market is, what the relevant market is. And here, they put in no evidence as to what the relevant market is. What they say is that, oh, well, Cole sells exclusive products, and the products we bought were private label Cole's products, and therefore it's appropriate just to look at the prices of the products that Cole sells. But respectfully, that doesn't make sense. That's like saying what they're saying is, well, Cole's private label products are their own market. That's like saying Toyota cars are its own market, and they don't compete with Honda and Nissan. What you have to do to figure out what the market price is, you have to define the market, and then you have to see what other products, comparable products of like grade and quality, compete. And there's no evidence in the record. And is that how you responded to them in the district court, that they were defining the market wrong? How we responded to them in the district court was that we said that to figure out the market price, you have to figure out the prices of comparable goods in the market. And there's no showing that they have done that. So I thought the dispute was about how to calculate the value with the sale prices and the different ways, the expectation, all this stuff, using Cole's products. Maybe I misunderstood this. But, I mean, was there a battle of experts over whether you should also be looking at Sears products or something? Well, there wasn't a battle of experts because we had the only expert evidence on that testimony, Your Honor. And we referred to that expert testimony in our briefs. And our expert, an economist named Dan Garrett, said very clearly that one cannot analyze what the market price for a product is only by using data for a single brand of a product. And that's at Supplemental Excerpt of Record 175. So we had an expert on Sermon Jordan saying, look, you can't just look at the prices that Cole sells it at. You have to look at comparable prices. And they've made no effort to do that. And that's on top of the fact that, as Judge Smith pointed out, their own expert said, I'm not offering any opinion on retail value. And if their own expert is unwilling to do that, it doesn't really make sense that this should be an argument that goes to the finder of fact, which, by the way, in this case would not be a jury, of course, because it's a UCL case. It would be the court itself. And as I understand it, just to take up these other issues, the reason we don't go for full refund is because the plaintiffs have already suggested that they have value in these products. So you can't go for a full refund because the full refund would only be available when the plaintiffs proved the product had no value, right? Absolutely right. And as you go to disgorgement, the reason that you would win on disgorgement, as I understand it, and I'm just trying to be fair, they want to have your profit as the disgorgement. And, frankly, what we're suggesting is under unrated tobacco, your profit is not available under a UCL case. And I would cite for that completely correct proposition, Your Honor, tobacco two. Once again, in tobacco two, the court of appeal expressly held, quote, plaintiffs contend Philip Morris's disgorgement of its profits would be restitutionary. We disagree. $240 callot forth at 801. So in terms of profits and in terms of full refund, I don't think they have a viable legal argument. And the only reason they don't have an argument as it relates to transaction percentage or actual discount is because it's outside of equity. I think that's correct, Your Honor. The way I would phrase it is what they're asking for is the amount of the, quote, promised discount. Yes. What Chowning says is that we should get, quote, the discount coals promised. All right? And they also say it's imperative to focus on the discount that Chowning thought she was receiving. And in that case, it would not be an equitable remedy, but instead a legal remedy because you're giving expectation damages. Exactly right. As Judge Klausner recognized, what they're asking for doesn't describe restitution because it's not restoring any money that was taken from the plaintiff. What they're asking for is I didn't get what I expected to get. And as you point out, Judge Smith, that is a benefit of the bargain remedy that's not even available in tort. It is only available in contract. And as we've seen, the UCL is not an all-purpose substitute for a tort or contract action. So we're down to trying to determine, once again, what this language means, difference between what the plaintiff paid and the value of what the plaintiff received, and that is the proper measure of restitution. That's really what we're about in this case. I think that's right, Your Honor. And what Chowning says is that, well, the value I received is zero because I wouldn't have bought the product at all if I had known about these misrepresentations. But that's not how value is measured under the UCL. And the plaintiff himself admits that because she's admitted in her brief that the value should equal the market price. That's not a subjective measure of, well, I wouldn't have paid for it, so the value to me is zero. That's the market price. And also in Pulaski, we have the Court saying that you have to look at what a reasonable consumer would pay. All right? That's not zero. You have to look at the value of the product itself, not whether she would have bought the product or not, because what that does is confuses standing with restitution. And as Judge Friedland pointed out, the standards are different. You can have a loss for purposes of standing simply because you wouldn't have bought the product if it were not for the misrepresentation. But for restitution, that's not the standard. As the Tobacco II Court said, for restitution, the loss required is not simply, well, I wouldn't have bought the product but for the misrepresentation. The loss required has to be that you paid more for the product than what you received in return. I'm still kind of confused about how you think we should evaluate what you received in return, because it seems like you said you don't think it's necessarily the sale price. That's right. I think you have to look at, I think you have to evaluate what the market price is. So you would look at, like, all robes sold or all terrycloth robes or whatever this is in the area. It doesn't seem like the District Court pointed to this market issue, though. The District Court, I don't see anything about the District Court crediting your experts definition of market over theirs. You're absolutely right, Judge Friedland. The District Court did not get into this issue. So do we, to rule for you, need to make a determination about what the proper market is and address an issue the District Court didn't? I don't think so. I think you can go on the fact that their expert admitted that he didn't have any opinion on the value of the product. I think that alone gets you to where you need to be. And also, you have Judge Klausner's analysis, which coincides with your analysis, Judge Friedland, that you can't measure the product by the life cycle of the product. You measure the product by the prior 90 days. And if you measure the product by the prior 90 days, there is no price value differential, even if you're just looking at the Kohl's prices. And that fact is set out very clearly in the chart that Judge Klausner put into his opinion. If the — if Chowning had testified that these products had no value to her at all, would the result be different? I don't think so, Your Honor, because I think it's a reasonable consumer standard. I think that's the only way it makes sense to go, because otherwise it would be completely varying from person to person as to what the value is. And I think the cases say that what we're talking about is market value and what a reasonable consumer would have paid. Unless Your Honors have any other questions, I think I'm done. All right. Thank you. Thank you. Let me save some time, give you a minute. Thank you. The statutes we're suing under give courts broad discretion to award any money that may have been acquired by any unfair practice. It's very broad discretion. In the Kwikset case, they specifically say that a deceived customer can get rescission. That's one of the remedies we're asking for. The J. Hill case also, a Supreme Court decision. But what would rescission look like here? You'd give back these used clothes? Absolutely. Absolutely. It doesn't really undo things, because now they get used clothes. They sold them to her on a fraud. It was a lie to begin with. That's why she has standing there. The consumer, the Kwikset case goes through this very extensive analysis of why a consumer suffers a monetary loss, an economic injury, when they buy something based on a fraud that they wouldn't have bought otherwise. All in an attempt to give standing. Correct. Not in an attempt to address the issue in front of us. And with respect, Your Honor, I would ask the court to read the Pulaski case again, because I do believe it's a restitution case. It's talking about what damages are available in the class certification context. Even if I read it, now we've got a new case right out of California, in Ray Tobacco Cases 2, which is after our Pulaski case. And it defines what we do. It doesn't, though, Your Honor. I understand your argument. Okay. Anything else? I would just say we talk about an equitable remedy. Coles promised to give her a $70 dress. It's never done that. She's still waiting for that $70 dress. Coles promised to give her a $46 robe. It's never done that. Where is the equity here? Okay. Thank you. Thank you. Case 16-56272 is submitted. We'll move now to case 16-56307, Romero v. Provide Commerce.
judges: N.R. Smith, Friedland, Lynn